```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                   AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                           CRIMINAL ACTION NO. 2:13-00120

**CURTIS WATKINS**


<u>MEMORANDUM OPINION AND ORDER</u>


Pending is the defendant Curtis Watkins' motion to suppress, filed June 6, 2013.

On June 17, 2013, the court held an evidentiary hearing attended by counsel for the parties and the defendant. The parties thereafter submitted post-hearing briefing, culminating in Mr. Watkins' July 10, 2013, reply brief. The matter is now submitted for decision. The court enters its findings of fact and conclusions of law as follows.


I.


In the early morning hours of September 22, 2012, three individuals were shot on Capitol Street in downtown Charleston, West Virginia, just outside Sam's Uptown Café and Sky Lounge. The one firing the shots was trying to strike an

individual who had been in a fight in Sam's.  He shot that individual and he also shot two others in the leg.

Charleston Police Department officers, including Detective Jason Webb, viewed an outside surveillance video from a nearby business from which they were able to identify Braheem Griffin, a convicted felon, as the shooter.  Based on that information, officers sought eight arrest warrants for Mr. Griffin, consisting of three charges of malicious wounding, being one for each individual hit, and five charges of wanton endangerment, being one for each bullet fired.

Three days after the shooting, on September 25, 2012, an off-duty officer, Corporal Basford, telephoned the station and reported to Detective Hunt that he saw Mr. Griffin entering Sistah's Rib Shack on 7th Avenue in the West Side of Charleston with three other black males.  Corporal Basford provided a clothing description for Mr. Griffin.  Detective Hunt passed the information along to the case agent, Detective Webb.

Detective Webb knew Mr. Griffin from past contact with him.  He knew that Mr. Griffin had been involved in several shooting incidents and that the firearm used by him at Sam's had not been recovered.  He believed Mr. Griffin to be armed and dangerous.

Acting promptly, Detective Webb and Detective Eric Tipton traveled in their unmarked cruiser (which did have a spotlight on the driver's side) to Sistah's in mid-day in an attempt to apprehend Mr. Griffin.  En route, they contacted a district supervisor to have other officers join them.  They drove past the front of Sistah's and observed through the glass door of that establishment four black males inside the restaurant.

They were dressed in hoodies matching the description given to Detective Webb that Mr. Griffin was wearing a red hoodie and the others were in black hoodies.  Detective Webb noted that one of the reports from the September 22, 2012, shooting mentions that there were other individuals on the scene that had not been identified, and that he wanted to question them about that incident.

The detectives did not observe any others in the restaurant.  They pulled into the parking area beside of Sistah's expecting to park and await the arrival of additional officers to aid in apprehending Mr. Griffin.  Neither detective was in uniform.  Detective Tipton was wearing a bulletproof vest that said "POLICE" across the chest.

As they pulled into the parking area beside Sistah's, which is set back well from the street, both detectives could see the front door of the restaurant. They observed a black male, later identified as the defendant, Curtis Watkins, come to the front door of Sistah's, open it part way, look into the police vehicle, make eye contact with Tipton, apparently recognize the two of them as police officers, then quickly spin around and walk back into the restaurant at a fast pace.

The detectives, believing they had been identified as law enforcement officers, immediately exited their vehicle and began approaching the doorway of the restaurant with their weapons drawn at the low ready position. The detectives did so in order to detain all of them quickly and ensure that they did not get a chance to destroy evidence, plan an ambush or flee out the back of the restaurant; and they did not want to remain in their vehicle and risk being shot by one who had just shot three people and would reasonably expect they were looking for him.

The detectives' suspicions concerning a possible warning by Mr. Watkins to Mr. Griffin ripened moments later. As the detectives were getting close to the doorway, all four males exited the restaurant in the detectives' direction. In the confusion of the moment, Detective Webb did not immediately recognize Mr. Griffin, but quickly did so and yelled out

4

"Braheem," and for him to get on the ground.  Detective Webb also loudly and repeatedly commanded all four individuals to get onto the ground.

Detective Tipton recognized Mr. Watkins as the individual who had previously opened the door, looked into the police vehicle, and hurried back into the restaurant.  As did Detective Webb, Detective Tipton repeatedly yelled out, commanding all four individuals to get onto the ground.  With the officers being outnumbered four to two, they were justifiably concerned for their own safety and that of the general public.

Although Detective Tipton did not at first know which one was Mr. Griffin, he did know that Detective Webb had identified Mr. Griffin and that Mr. Watkins should be regarded as dangerous because he was in the company of Mr. Griffin, who was known to be very violent.

Two of the four males immediately complied with the detectives' commands to get onto the ground.  However, Mr. Watkins and Mr. Griffin hesitated, looked around, seemed to be thinking whether to flee or fight, and briefly refused to follow the commands.  After a few seconds, Mr. Watkins and Mr. Griffin did comply.  Detectives Webb and Tipton began securing the four

males and handcuffed them just as Sgt. Peoples and another patrol officer were arriving on the scene.

Once all four men were on the ground on their stomachs and handcuffed with their hands behind their backs, Detective Tipton told Mr. Watkins that he was going to pat him down for officer safety and asked him whether he had anything on his person that Detective Tipton should know about. Mr. Watkins looked down at the right side of his waistline and responded that he had a gun. Detective Tipton then reached to the right side of Mr. Watkins' body and could feel a firearm in his waistline, under his shirt. He lifted the shirt and saw a black-semi-automatic handgun sticking out of his waistband. At Detective Tipton's request, Sgt. Peoples removed a loaded Jennings 9 mm handgun from the defendant's waistband, ejected the magazine and removed a loaded round from the chamber. Detective Webb likewise recovered a Ruger 9 mm handgun from Mr. Griffin.

Mr. Watkins, who acknowledged that he was on federal "probation" (actually, supervised release), was arrested as a convicted felon in possession of a firearm. Mr. Griffin was arrested on the charges arising out of the Capitol Street shootings at Sam's. The other two were released.

II.

A.   Governing Fourth Amendment Standards

The Fourth Amendment protects the citizenry "against unreasonable searches and seizures." U.S. Const. amend. IV. It is critical to first properly characterize any police-citizen encounter in order to ascertain if the Fourth Amendment threshold has been crossed. Our court of appeals has observed as follows:

> The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.

United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002) (citations omitted).

Only the first two types of encounters are potentially here involved. First, respecting arrest, the probable cause standard is "an objective one; it exists when, at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Johnson, 599 F.3d 339, 346 (4th Cir. 2010)(citation

and internal quotation marks omitted); Gerstein v. Pugh, 420 U.S. 103, 111 (1975).  The existence of probable cause "always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct."  Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992).

Second, respecting investigatory or Terry stops, law enforcement may detain a person for brief inquiry when supported by reasonable suspicion arising from articulable facts indicative of criminal misconduct.  Illinois v. Wardlow, 528 U.S. 119, 123–24 (2000); Terry v. Ohio, 392 U.S. 1, 30 (1968).  Reasonable suspicion depends upon the totality of the circumstances, including what the officer knows and any reasonable inferences that might be drawn when the stop occurs.  United States v. Sokolow, 490 U.S. 1, 8 (1989); United States v. Black, 525 F.3d 359, 364-65 (4th Cir. 2008).

Importantly, reasonable suspicion may exist despite the fact that "each individual factor 'alone is susceptible of innocent explanation.'"  Black, 525 F.3d at 365 (quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)).  In particular, evasive behavior and alarmed reaction support a reasonable suspicion of criminal activity.  United States v. Smith, 396 F.3d 579, 584 (4th Cir. 2005); United States v. Humphries, 372

F.3d 653, 657 (4th Cir. 2004); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).

When it comes to conducting a Terry pat down of a suspect for weapons, the standard is equally well settled:

> Reasonable suspicion is a particularized and objective basis for suspecting that the person to be frisked is armed and dangerous. Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27, 88 S.Ct. 1868. "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," Illinois v. Wardlow, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), and it is measured by the totality of the circumstances, United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

United States v. Powell, 666 F.3d 180, 186 (4th Cir. 2011) (footnotes omitted).

It is important to bear in mind two considerations in this context. First, "reasonable suspicion" is a "less demanding standard than probable cause," requiring a showing "considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Second, the court is not bound by the officers' subjective understandings of where a particular encounter might fall on the Fourth Amendment spectrum. The analysis is entirely objective. As the Supreme

9

Court reiterated recently:

> "Our cases have repeatedly rejected" a subjective approach, asking only whether "the circumstances, viewed objectively, justify the action." Indeed, we have never held, outside limited contexts such as an "inventory search or administrative inspection . . ., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment."

<u>Kentucky v. King</u>, 131 S. Ct. 1849, 1859 (2011) (citations omitted).

B.  Analysis

Law enforcement responded to Sistah's, a location where they had cause to believe a violent, armed individual was present. They had further reason to believe that when the September 22, 2012, shooting occurred just days earlier, Mr. Griffin was potentially in the company of other individuals. When the detectives arrived at Sistah's, they saw through the window an individual whom they surmised was, according to the clothing description of another officer, Mr. Griffin in the company of three other males.

One of those three individuals, Mr. Watkins, came to the front door of Sistah's, opened it enough to see Detectives Webb and Tipton, making eye contact with Detective Tipton, at

which time he quickly spun around and retreated into the restaurant.

Mr. Watkins' behavior and the totality of the circumstances suggested he identified the detectives as law enforcement agents. His conduct and the speedy exit from Sistah's by the four men gave rise to the objective belief that Mr. Watkins alerted Mr. Griffin to the detectives' presence in an effort to assist him in fleeing, destroying evidence, or planning an ambush of the detectives.

As such, the detectives had not only probable cause to arrest Mr. Griffin based upon the outstanding charges, but also a well-founded, reasonable suspicion that Mr. Watkins had violated West Virginia Code section 61-11-6(b), which provides as follows:

> [A]ny person who knowingly . . . assists the principal felon after the commission of the underlying offense violating the felony provisions of sections one, four, or nine of article two of this chapter, or gives such offender aid knowing that he or she has committed such felony, with the intent that the offender avoid or escape detention . . . shall be considered an accessory after the fact and, upon conviction, be guilty of a felony and confined in a state correctional facility for a period not to exceed five years . . . .

W. Va. Code § 61-11-6(b).[1]  That reasonable suspicion was enhanced by Mr. Watkins' evasive and apparently alarmed reaction exhibited by his quick turnaround move once he noticed the detectives surveiling the restaurant.

The reasonable suspicion arising from Mr. Watkins' behavior, along with safety considerations in apprehending a dangerous felon, likely armed and accompanied by three other men, with law enforcement outnumbered two-to-one, justified not only the detectives' arrest of Mr. Griffin but, at a minimum, the Terry stop of Mr. Watkins, who appeared to be acting in concert with Mr. Griffin.

The circumstances further justified a pat down search of Mr. Watkins for weapons.  The totality of the circumstances suggest that he was acting as an accessory after the fact, the one to whom he was possibly rendering aid was presumed armed and dangerous, and when that principal, Mr. Griffin, disobeyed the detectives' request to get on the ground, Mr. Watkins followed suit in ignoring the request.  Under these rapidly unfolding circumstances, and to the extent law enforcement lacked probable

---

[1] West Virginia Code section 61-2-9(a) criminalizes the malicious shooting of a person with the intent to disable or kill them.  Mr. Griffin's malicious wounding charges would thus qualify as a predicate principal charge upon which to base accessory liability against Mr. Watkins.

cause at that point to arrest Mr. Watkins as an accessory, a reasonably prudent officer would have been justified in the belief that his safety or that of others was in danger occasioned not alone by Mr. Griffin but also by Mr. Watkins and possibly the others. While the weapon was recovered based upon Mr. Watkins' disclosure of its location prior to the pat down search, its discovery would have inevitably occurred during the lawful pat down that surely would have followed.[2]

It bears further emphasis that although Mr. Watkins was handcuffed, a pat down was warranted. As Detective Webb testified, a pat down was necessary, even though Mr. Watkins was handcuffed, "simply because people can manipulate handcuffs."

---

[2] Moreover, the question posed to Mr. Watkins concerning the presence of a weapon was nevertheless permissible. It is well-settled that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." New York v. Quarles, 467 U.S. 649, 657 (1984).

The court recognizes that the Quarles exception does not often apply to ordinary and routine arrests, such as the circumstances found in United States v. Mobley, 40 F.3d 688 (4th Cir. 1994). In that case, Mobley was encountered naked, a security sweep had been made of his premises, and he was the sole individual present in the apartment searched. In contrast to Mobley, this case involved detectives who were dealing with an individual who had disobeyed their instructions to go to the ground and who also could reasonably have been deemed to have aided an armed and dangerous felon. Those circumstances bring the detective's question within the Quarles exception to the Miranda rule.

(Tr. at 47). Indeed, Detective Webb believed Mr. Watkins could have done so and he was reasonably justified in so concluding. Substantial case law indicates detainees have escaped their cuffs and wreaked havoc. See, e.g., People v. Schrock, 969 N.Y.S.2d 668, 669 (N.Y. App. Div. 2013) ("While he was sitting in the back seat, defendant managed to free one hand from his handcuffs and attack the deputy."); Plakas v. Drinski, 19 F.3d 1143, 1144-46 (7th Cir. 1994) (stating that handcuffed suspect placed in the backseat of a police car escaped from car and confronted officers); United States v. Sanders, 994 F.2d 200, 210 & n.60 (5th Cir. 1993) (citing additional examples where handcuffed arrestees killed officers); see also David S. Chase, Who Is Secure?: A Framework For Arizona v. Gant, 78 Fordham L. Rev. 2577, 2598 (2010) ("Indeed, though unusual, handcuffed arrestees have escaped from the backseat of police cars and injured officers.").[3]

Based upon the foregoing discussion, it is ORDERED that Mr. Watkins' motion to suppress be, and hereby is, denied.

---

[3] A very recent tragedy along these lines occurred in our own state. See Greg Carter, Police Release More Details on Deadly Trooper Shooting, available at http://www.wvva.com/story/19407837/shooter-identified-as-luke-baber-of-oak-hill?clienttype=printable (Aug. 29, 2012) ("Police say Luke Baber, 22, of Oak Hill shot troopers Marshall Lee Bailey and Eric Michael Workman while handcuffed in the back of their patrol car. Baber apparently used a gun he had in his possession prior to his arrest").

The Clerk is directed to transmit a copy of this written opinion and order to the defendant and all counsel of record.

ENTER: September 9, 2013

John T. Copenhaver, Jr.
United States District Judge